Filed 11/5/24  P. v. Wheeler CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>AARON WHEELER,<br><br>     Defendant and Appellant. | B323019<br><br>(Los Angeles County<br>Super. Ct. No. KA121209) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rogelio Delgado, Judge.  Affirmed.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Nikhil D. Cooper, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

Aaron Wheeler appeals from the judgment entered after a jury found him guilty of second degree murder (Pen. Code, § 187, subd. (a)).[1]  Wheeler contends that when the only eyewitness to the shooting could not be located before trial, the trial court erroneously found the prosecution had exercised reasonable diligence to find her and thus erred in allowing the prosecution to read her preliminary hearing testimony to the jury in her absence.  Wheeler further asserts the court should have sua sponte instructed the jury on voluntary manslaughter based on heat of passion.  Finally, he contends the evidence established as a matter of law that Wheeler acted in self-defense.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Hendricks's Statements*

At trial, the court determined witness Ashlee Hendricks was unavailable to testify and allowed the jury to hear Hendricks's testimony from Wheeler's preliminary hearing, as well as Hendricks's recorded police interview that was played during her testimony.

1.    *Hendricks's Preliminary Hearing Testimony*

At the November 5, 2019 preliminary hearing, Hendricks testified she rented a hotel room on March 8, 2019.  Freddy Magana came over, and they had sex.  Hendricks had known Magana for a month.  They sometimes smoked methamphetamine together.

Magana's friend Matthew Hathaway arrived at the hotel room with drugs and a gun, both of which he gave to Magana.

---

[1]    Undesignated statutory references are to the Penal Code.

2

Magana briefly showed Hendricks the gun and then gave it back to Hathaway.

That afternoon, Hendricks left in her car and picked up Wheeler from his father's house. Wheeler was a family friend of Hendricks. In the past, they had smoked weed and methamphetamine together.

Hendricks and Wheeler ran some errands. Meanwhile, Magana and Hathaway accidentally locked themselves out of the hotel room. Magana was irritated and called Hendricks several times. Hendricks refused to return to the hotel room right away because she "wasn't going to drop what [she] was doing."

After several hours, Hendricks and Wheeler returned to the hotel room to let Magana and Hathaway inside. Magana yelled at Hendricks for leaving him and Hathaway outside the hotel room for hours. Wheeler politely told Magana, " 'Look, you can't expect her to drop everything and let you guys in.' " Magana replied, " 'Why don't you fucking mind your own business? . . . We were all stuck here.' " Wheeler "stayed quiet." Hendricks said, " 'Look . . . I had to stop what I was doing to let you guys in. Please won't [*sic*] come at him like that. Please do not disrespect him like that.' "

After the argument, Hathaway left and took his gun with him.[2] Both Wheeler and Magana asked Hendricks for a ride home. Hendricks agreed to drive them and to drop Wheeler off first. By the time they left, it was dark.

During the 15-to-20-minute drive, Wheeler and Magana talked about getting high. The conversation was stress-free and

---

[2] Hathaway left the hotel at 7:20 p.m. and went to his house where he remained for the rest of the night. He died in a traffic collision in October 2020.

"chill." The three decided to pick up some needles from Wheeler's father's house and to get high in Hendricks's car.

When they arrived at Wheeler's father's house, Wheeler said, " 'I will be right back,' " and he went inside the house. While Wheeler was gone, Magana stepped outside the car to smoke a cigarette. Five or six minutes later, Wheeler returned and pointed a gun at Magana with the barrel pointed down at a 45-degree angle. Wheeler said, " 'Come over here. Come talk to me.' " Magana reached toward the back of his waistband with his right hand and said, " 'If you want to light this shit up, we can all light this shit up.' " Based on Magana's motion and words, Hendricks thought Magana had a gun.

Hendricks heard a gunshot and saw Wheeler shoot Magana in the hand. A few seconds later, Hendricks heard one or two more gunshots as she saw Magana take two or three steps toward Wheeler before falling to the ground. Hendricks never saw Magana with a gun at any point during the drive to Wheeler's father's house or during the shooting.

Wheeler ran toward his father's house and came back seconds later with the gun still in his hand. Wheeler said, " 'Take me to my mom's house.' " Hendricks looked at Magana on the ground and said, "We need to take him to the hospital." Hendricks called 911 but hung up before speaking to anyone. Wheeler didn't say anything. Hendricks then drove Wheeler to his mother's house where they stayed the night. The following morning, Hendricks dropped Wheeler off at a park a few blocks away from his father's house.

2. *Hendricks's Police Interviews*

About a week after the shooting, on March 21, 2019, detectives with the Pomona Police Department (PPD)

4

interviewed Hendricks. A portion of the audio and video recording of that interview was played at the preliminary hearing during the redirect examination of Hendricks, followed by the defense's recross-examination of Hendricks. The defense did not object to the recording being played at the preliminary hearing. The same video and audio recording of that March 21 interview was played for the jury at trial.

Hendricks's March 21 account of the shooting and the events leading up to it was substantially the same as her preliminary hearing testimony.[3] Hendricks explained that during the drive to Wheeler's father's house, Wheeler and Magana "were talking it out, like everything was all cool." The prior argument had been "squashed," and the two men "weren't even fighting." But after they arrived and Wheeler went inside his father's house, Wheeler came "running back out, and then I see him point the gun [at Magana], and like, you know, come on over here take a walk with me, over here." Hendricks said Wheeler was about three feet away from Magana while pointing the gun at him.

On May 31, 2019, Hendricks spoke to the police for a second time. At trial, the prosecutor questioned PPD Detective David Freeman about that interview with Hendricks. The prosecutor indicated the recording of that interview would not be played for the jury because it had not been played during the preliminary hearing, but the prosecutor stated he would ask Freeman questions about that interview "in a leading fashion unless counsel has a different perspective on it." Defense counsel did not object. The prosecutor elicited testimony from Freeman that during the interview Hendricks stated she had been truthful

---

[3]     The parties agree on this point.

during her earlier March interview with the police. Hendricks additionally said that after speaking to detectives in March, her life was "ruined," and she was in danger. Unknown people had beaten up her mother and during the beating asked for Hendricks. Hendricks did not want to be a " 'snitch,' " and thus she had not stayed in touch with the detectives after her March interview. Hendricks also stated her phone had been stolen.

B.    *Wheeler's Police Interview*

On May 9, 2019, PPD detectives interviewed Wheeler. A recording of the interview was played for the jury.

Wheeler initially told detectives that on the day of the shooting, Hendricks picked up Wheeler at his father's house. Hendricks drove Wheeler to "some motel in Ontario." At the motel, there were two men: a "White guy and a Mexican dude." Magana was "maybe" one of the men. Wheeler left the hotel and took a bus to his father's house. Wheeler's father then drove Wheeler to his mother's house. The next day, Wheeler went back to his father's house and saw "yellow tape" around the crime scene in front of his father's house.

After furthering questioning, Wheeler changed his story. He said that after arriving at the motel, he, Hendricks, and Magana drove to Wheeler's father's house. As Wheeler was getting out of the car, Magana "pulled a gun out" on Wheeler. Wheeler "smacked it out" of Magana's hand and ran inside his father's house. Magana was alive when Wheeler ran off, and Wheeler did not hear any gunshots. Wheeler's father then drove him to his mother's house.

6

C.    *The Investigation*

On the morning of March 9, 2019, PPD officers responded to a radio call and found Magana's body in the street. At the crime scene, PPD investigators collected two nine-millimeter cartridges and a piece of a bullet. Based on the firearm evidence collected, a firearms expert with the Los Angeles County Sheriff's Department opined that the shooter fired a semi-automatic firearm at Magana.

Lawrence Nguyen, a Deputy Medical Examiner for Los Angeles County, performed an autopsy on Magana and observed that he had two "through and through" gunshot wounds: one wound on his torso and the other on his "right wrist hand area." The cause of death was a gunshot wound to the torso. Nguyen opined that when Magana was shot in his right hand, the back of his hand faced the shooter. The gunshot that passed through Magana's torso had a "downward trajectory as it passed through the chest." Ngyuen opined that Magana and the shooter were standing face-to-face, and Magana was bent forward at the waist when shot in the torso.

A hotel registration card showed Hendricks checked into the hotel for the nights of March 7 and March 8, 2019. Video surveillance footage from the hotel showed at 7:09 p.m. on March 8, Wheeler, Magana, Hendricks, and Hathaway entered a hotel room together. Twenty minutes later, Hathaway left the hotel room. A minute later, Wheeler left the room, and six minutes later, Magana and Hendricks left. Phone records showed Hendricks's and Wheeler's phones were together at the motel and then at Wheeler's mother's house.

D.  *Jury Verdict and Sentencing*

A jury found Wheeler guilty of second degree murder
(§ 187, subd. (a)) and found several firearm enhancements true
(§ 12022.53, subds. (b)-(d)).  The trial court sentenced Wheeler to
a total term of 40 years to life in state prison, consisting of 15
years to life for the murder, plus a consecutive term of 25 years to
life for the section 12022.53, subdivision (d), firearm
enhancement.

Wheeler timely appealed.

## DISCUSSION

A.  *The Trial Court Did Not Err by Finding Hendricks*
   *Unavailable at Trial and Admitting Her Prior Testimony*

Wheeler contends the trial court erred by admitting
recordings of Hendricks's preliminary hearing testimony and her
March 21, 2019 police interview without an adequate showing
that the prosecution exercised due diligence in attempting to
secure her presence at trial.  We affirm the trial court's ruling.

1.  *Relevant Evidence at Due Diligence Hearing*

A due diligence hearing was conducted prior to trial.  The
prosecutor presented information "as an officer of the court"
about the prosecution team's efforts to locate Hendricks and also
called Detective Freeman to testify.  A portion of the hearing was
held in camera with only the prosecutor and the detective
present.

The prosecutor told the court that a week after the murder,
in March 2019, detectives interviewed Hendricks at the police
station.  Hendricks "made it clear" she saw Wheeler shoot and
kill Magana.  This made Hendricks "clearly the most important

8

witness in this case." Hendricks also told detectives she was scared to talk to them. The detectives did not hold Hendricks after the interview. Two months later, on May 31, detectives arrested Hendricks and interviewed her again in custody. At that point she said she was scared of being a " 'snitch' " and felt her life was " 'in danger.' " She said she didn't know the detectives "needed help like this" and "now it's gotten really bad."

The prosecution charged Hendricks with being an accessory after the fact (§ 32) for her role in the murder. Hendricks remained in custody until the preliminary hearing in November 2019. At the preliminary hearing, Hendricks initially refused to testify. But after the People granted her immunity, Hendricks agreed to cooperate and testify. After the preliminary hearing, the trial court dismissed the case against Hendricks over the People's objection (deeming the People's offer of immunity broader than what the People asserted), released her from custody, and ordered her to stay in touch with the People. Hendricks gave her cell phone number to the prosecutor and the detectives.

The Covid pandemic ensued, resulting in Wheeler's trial being delayed for a significant period of time. For two and a half years, until May 2022, the prosecutor "maintained periodic contact" with Hendricks via text, and she responded "most of the time."

On April 26, 2022, the trial court scheduled the trial for June 14. At that time, the prosecutor was aware Hendricks was living at a long-stay motel in Ontario. Also, on April 26, the prosecutor texted Hendricks, who agreed to meet for lunch the following Friday. The next day, the prosecutor asked Hendricks where she would like to meet. Hendricks did not respond for the

9

next five days.  The prosecutor then texted Hendricks on May 2, 3, 9, and 10, but Hendricks did not respond to any of the texts.  On May 12, Hendricks texted him back, " 'Hadn't had a phone but already hounding me is ridiculous.' "

The prosecutor apologized for " 'hounding' " her and stated, "We had agreed to meet on Friday, 5-6, but you ghosted me since 4-27.  The case is serious.  And if I am going to communicate with the judge, I need to do my due diligence . . . .  If you lose or break your phone, let [your child's guardian] know to let me know."  The prosecutor texted her again on May 18 and May 22, asking to talk.  He then texted her again on May 23, advising her that he would report to the court she was being "intentionally uncooperative."  Hendricks did not respond to any of the prosecutor's texts.

On June 14, 2022, the trial court continued the trial to July 14 and set a readiness hearing for July 11.  On June 16, the prosecutor texted Hendricks, "I have concluded that you are intentionally ignoring me and no longer cooperative.  Is that accurate?"  On June 17, he texted her, "I'm not trying to hound you but am trying to make this easy."  During that time, a detective called and texted Hendricks but similarly received no response.  On June 23, the prosecutor filed an ex parte "request for a forthwith subpoena" for Hendricks under section 1332[4],

---

[4]     "Section 1332 provides, in pertinent part, that 'when the court is satisfied, by proof on oath, that there is good cause to believe that any material witness for the prosecution or defense . . . will not appear and testify . . . the court may order the witness to enter into a written undertaking to the effect that he or she will appear and testify at the time and place ordered by the court or that he or she will forfeit an amount the court deems

which subpoena the court signed that day. The prosecutor and the detective agreed that around July 12, they would start the process of serving the subpoena and detaining Hendricks to bring her before the court. The prosecutor took a two-week vacation and returned to work on July 11.

When the prosecutor returned on July 11, the court held a readiness hearing. Around that time, detectives had been conducting surveillance of Hendricks and had obtained what they believed was a "good address" for her. During the hearing, defense counsel requested a continuance because he was engaged in another trial. The trial court trailed the readiness hearing to July 13.

On July 13, in the morning, defense counsel was still engaged in another trial, and the court continued Wheeler's trial to July 25. Because of the continuance, the prosecutor indicated, the detectives "called off the surveillance crew" who had "been working for so many hours." However, by the afternoon, defense counsel's other trial settled and the court ordered both parties to return to court the following day.

At the next day's hearing, the court set the trial for July 19, 2022. Detectives then resumed the search for Hendricks, with different teams surveilling two locations on July 15, 17, and 18 "for a number of hours."

One team surveilled the home of Hendricks's mother without any success. The surveillance was "pretty complicated"

---

proper.' (§ 1332, subd. (a).) 'If the witness required to enter into an undertaking to appear and testify . . . refuses compliance with the order . . . the court may commit the witness . . . to the custody of the sheriff.' (§ 1332, subd. (b).)" (*People v. Holmes, McClain & Newborn* (2022) 12 Cal.5th 719, 779, fn. 34.)

11

and involved checking if Hendricks was "coming in through the back doors or if food [was] being delivered."

The other team surveilled a hotel in Ontario that detectives "knew was a good address" for Hendricks because she had been at that address "for some time." The legal guardian of Hendricks's young daughter brought the child to visit Hendricks weekly at that hotel. The guardian had most recently dropped the child there a week earlier but had not seen Hendricks since July 12 or 13. Since then, Hendricks had dropped all communication with the guardian.

On July 15, detectives conducted surveillance of the hotel from 10:00 a.m. to 10:30 p.m. This was repeated on July 17 for 10 hours and on July 18 for four to five hours. The detectives found mail for Hendricks at the hotel on July 15, and the hotel manager confirmed that Hendricks had stayed there. The manager said she would contact detectives if she saw Hendricks, but she never called. Detectives did not see Hendricks at any point.

Hendricks was unemployed, "transient," and had no other known residential addresses. The prosecution checked several other potential leads that were not fruitful. Hendricks had not been recently arrested, was not in county jail, was not deceased, was not at Pomona Valley Hospital, and had no active warrants.

The People argued their efforts reflected due diligence. They requested to read Hendricks's preliminary hearing testimony to the jury and play the portion of Hendricks's March police interview that was played during the preliminary hearing.

Defense counsel acknowledged Hendricks and the prosecutor had been in "consistent contact" and "had a relationship" until Hendricks stopped replying to the prosecutor's

12

texts in May 2022. However, defense counsel argued the People knew Hendricks was a transient "drug addict" and that she was not going to cooperate, and yet the People "wait[ed] a long time in order to enforce [her] attendance."

The trial court found the People had met their burden to demonstrate due diligence. The court stated, "It is obvious that the witness is evading process and she is reluctant just like perhaps a lot of witnesses are, but she's gone deep undercover . . . she had some communication with the People all the way to May and then she just stopped. They're not able to locate her. They're unable to find her at her hotel, using her phone—nothing." Based on that evidence, the court found Hendricks was unavailable and ordered the People could read Hendricks' preliminary hearing testimony and play part of her police interview for the jury.

### 2. *Relevant Legal Principles*

Under the confrontation clauses of both the federal and state Constitutions, a criminal defendant is guaranteed the right to be confronted with the witnesses against him. (U.S. Const., 6th Amend.; Cal. Const. art. I, § 15.) "To deny or significantly diminish this right deprives a defendant of the essential means of testing the credibility of the prosecution's witnesses, thus calling 'into question the ultimate " 'integrity of the fact-finding process.' " ' " (*People v. Cromer* (2001) 24 Cal.4th 889, 897 (*Cromer*).) However, "the right is not absolute. If a witness is unavailable at trial and has given testimony at a previous court proceeding against the same defendant at which the defendant had the opportunity to cross-examine the witness, the previous testimony may be admitted at trial." (*People v. Sanchez* (2016) 63 Cal.4th 411, 440, quoting *Barber v. Page* (1968) 390 U.S. 719,

13

725; see Evid. Code, § 1291, subd. (a)(2) [permitting use of prior testimony in a proceeding if the party seeking to exclude the testimony had "the right and opportunity to cross-examine the declarant with an interest and motive similar to that which" the same party will have "at the [present] hearing"].)

As pertinent here, a declarant may be deemed "unavailable as a witness" if he or she is "absent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) "[T]he prosecution bears the burden of showing that the witness is unavailable and, additionally, that it made a 'good-faith effort' [citation] or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial." (*People v. Sanchez*, *supra*, 63 Cal.4th at p. 440; accord, *People v. Fuiava* (2012) 53 Cal.4th 622, 674-675 (*Fuiava*); *People v. Windfield* (2021) 59 Cal.App.5th 496, 510-511.)

"[T]he term 'due diligence' is 'incapable of a mechanical definition,' but it 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' [Citations.] Relevant considerations include ' "whether the search was timely begun" ' [citation], the importance of the witness's testimony [citation], and whether leads were competently explored." (*Cromer*, *supra*, 24 Cal.4th at p. 904; accord, *Fuiava*, *supra*, 53 Cal.4th at p. 675.)

"Ordinarily, '[t]he prosecution is not required "to keep 'periodic tabs' on every material witness in a criminal case" ' " (*People v. Herrera* (2010) 49 Cal.4th 613, 630), because " 'the administrative burdens of doing so would be prohibitive' " (*Fuiava*, *supra*, 53 Cal.4th at p. 676). However, when the

14

prosecution has "knowledge of 'a "substantial risk" ' that an ' "important witness would flee," ' the prosecutor is required to ' "take adequate preventative measures" to stop the witness from disappearing.' " (*People v. Friend* (2009) 47 Cal.4th 1, 68.)

"We determine de novo whether due diligence was demonstrated." (*People v. Windfield*, *supra*, 59 Cal.App.5th at p. 508.) In conducting this review, "we 'defer to the trial court's determination of the historical facts of what the prosecution did to locate an absent witness.' " (*People v. Thomas* (2011) 51 Cal.4th 449, 503 (*Thomas*).)

### 3. *The Prosecution Exercised Due Diligence*

Hendricks was the prosecution's key witness. Besides Wheeler, she was the only living witness to the events at the hotel and the only eyewitness to the murder itself. Wheeler contends the prosecution was required to " 'take adequate preventative measures' " to stop its main witness from disappearing, when the prosecution knew Hendricks was likely not to appear, was a drug user, initially refused to testify at the preliminary hearing, and "had a history of failing to keep in touch."

Wheeler relies on *People v. Louis* (1986) 42 Cal.3d 969 (*Louis*), disapproved on another ground in *People v. Mickey* (1991) 54 Cal.3d 612, 672, fn. 9. In *Louis*, the prosecutor in a capital murder case allowed his key witness, who was then in custody, to be released on his own recognizance to spend the weekend "with an unnamed friend at an undisclosed address." (*Id.* at p. 978.) Upon release, the witness "promptly disappeared," and the prosecutor was unable to locate him prior to trial. (*Ibid.*) The trial court allowed the prosecution to play the witness's

15

preliminary hearing testimony for the jury.  (*Id.* at p. 981.)
Ultimately, the defendant was sentenced to death.  (*Id.* at p. 982.)

Our Supreme Court reversed the trial court's finding that
the prosecution exercised due diligence to locate the witness.  The
court emphasized that "the sole evidence identifying defendant as
the trigger man" came from this witness, who had stated that the
defendant confessed to him.  (*Louis*, *supra*, 42 Cal.3d at p. 989.)
The witness's "credibility was indisputably minimal":  he had
significantly changed his story that incriminated the defendant
multiple times; "he had been committed to a hospital for the
criminally insane;" he had been convicted of several moral
turpitude felonies; and he "apparently had some expectation of
receiving a reward if the defendants were convicted as a result of
his testimony."  (*Id.* at pp. 974, 977, 989.)  Moreover, the court
emphasized, this witness "habitually failed to make court
appearances," and the trial court had opined he was "one of the
flakiest, most unreliable witnesses" the court had ever
encountered.  (*Id.* at p. 989.)  The Supreme Court determined he
"was precisely the type of witness that a jury needs to scrutinize
in person in order to intelligently evaluate his credibility and the
truth or falsity of his testimony."  (*Ibid.*)

The court concluded, "On the facts of this case, the
diligence required of the prosecution to prevent [the witness]
from becoming absent was particularly high."  (*Louis*, *supra*,
42 Cal.3d at p. 991.)  "[T]he prosecution—at the very minimum—
could have attempted to obtain from [the witness] and
independently verify the name and address of the friend with
whom he allegedly intended to spend the weekend.  Further, it
could then have [been] arranged that he be kept under
surveillance during that period of time. . . .  But the failure to

16

take such minimal action plainly conflicts with the claim that the prosecution exercised due diligence." (*Id.* at p. 992.) The court concluded that the People " 'failed to exercise virtually any effort to prevent [the witness] from becoming absent' " (*id.* at p. 991), and that the prosecution's failure may have been based on "something other than mere indifference," suggesting the prosecution may have hoped the witness would disappear, because he "would not look as good in person as he does in reading out of the transcript" (*id.* at p. 993, fn. 7).

Since *Louis*, our Supreme Court has noted that "[t]he circumstances in *Louis* were unusual," and "[s]ubsequent cases have limited the holding in *Louis* to its peculiar facts." (*Thomas*, *supra*, 51 Cal.4th at pp. 500, 502.) Such unusual circumstances are not present here. Hendricks's status as a transient methamphetamine abuser was not a sufficient basis to deem her unreliable or lacking credibility. Although Hendricks initially refused to testify at the preliminary hearing, she did, in fact, testify, and her testimony was consistent with her earlier account to police. And despite initially failing to keep in touch with detectives and expressing fear of repercussions for being a "snitch," she stayed in touch with the prosecutor after the preliminary hearing for two and a half years. Given the long delay of the trial in part due to the Covid pandemic, and given the charges against Hendricks had been dropped, the prosecution cannot be faulted, as the *Louis* prosecutors were, for the fact that Hendricks was not kept in custody pending trial. And while the prosecution and detectives knew Hendricks did not have a stable home, they believed they had a "good address" for her at a motel as the trial date approached, and they reasonably expected they

could keep track of her given her young daughter lived with her legal guardian in the area.

Nor do we agree with Wheeler that the prosecution's efforts to secure Hendricks's presence were insufficient because "they were started too late." As discussed, the prosecutor had maintained contact with Hendricks throughout the pandemic. Once the trial date drew near and it became clear Hendricks was becoming uncooperative, the prosecution team obtained a section 1332 subpoena for her three weeks before the trial date, but then they were unable to find her to serve it. Surveillance for Hendricks began around July 11, 2022, about a week before the trial, and continued on July 15, 17, and 18. Given the circumstances, the prosecution's efforts were commenced timely. (Compare *People v. Linder* (1971) 5 Cal.3d 342, 346 [due diligence exercised where defendant attempted to serve subpoena on witness only one day before trial, but defendant's attorney had hired a detective to find witness and had previously contacted witness' relatives]; *People v. Saucedo* (1995) 33 Cal.App.4th 1230, 1236, disapproved on another point by *Cromer*, *supra*, 24 Cal.4th at p. 901, fn. 3 [sufficient due diligence where police searched a full week for witness beginning on the first day of trial]; *People v. Smith* (1971) 22 Cal.App.3d 25, 31-32 [same where subpoena issued one week before trial and witness had assured police he would be available to testify]; *People v. Rodriguez* (1971) 18 Cal.App.3d 793, 796-797 [same where prosecution tried for six days before trial to serve subpoena on witness who was hiding to avoid service because he feared testifying]; and *People v. Benjamin* (1970) 3 Cal.App.3d 687, 697, disapproved on other grounds by *People v. Brigham* (1979) 25 Cal.3d 283, 292, fn. 14 [same where search for witness began four days before trial,

witness had previously cooperated, and witness had been sent to Vietnam on military tour]; with *Cromer*, *supra*, 24 Cal.4th at pp. 904-905 [due diligence not established where prosecutor knew the witness disappeared two weeks after the preliminary hearing but waited six months to search for witness and then failed to follow up on a possible lead]; *People v. Avila* (2005) 131 Cal.App.4th 163, 169-170 [no due diligence where prosecutor waited until first day of trial to locate witness at last known residence without efforts to keep track of her, despite knowing she was a flight risk].)

In addition, the search for Hendricks was thorough. Two different teams conducted surveillance at two possible addresses: Hendricks's mother's home and a hotel. The hotel was a strong lead considering detectives found mail for Hendricks there and the guardian of Hendricks's daughter as well as a hotel worker confirmed Hendricks had been staying there up until roughly a week before the trial date. Detectives also checked the jail, a local hospital, and the morgue. Detectives spoke with Hendricks's child's guardian, but the guardian denied having recent contact with Hendricks. By diligently pursuing various leads, the prosecution's search efforts demonstrated competence. (See *Fuiava*, *supra*, 53 Cal.4th at p. 677 [prosecution sufficiently pursued leads by checking possible addresses and hospital and jail records, attempting to locate witness's brother, and interviewing neighbors]; *People v. Wilson* (2005) 36 Cal.4th 309, 342-343 [prosecution sufficiently pursued leads by visiting witness's last known address, attempting to locate known associates, and checking police, county, and state records].)

Wheeler argues the prosecution should have made more vigorous efforts to reach Hendricks, including contacting

Hendricks through social media and reaching out to other local hospitals. However, " '[i]t is enough that the People used reasonable efforts to locate the witness.' " (*Fuiava*, *supra*, 53 Cal.4th at p. 677; accord, *Hardy v. Cross* (2011) 565 U.S. 65, 71-72 ["when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence [citation], but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising"].) Further, it appears Hendricks made a deliberate effort to avoid being found. She was aware that her testimony was critical and that the prosecutor was attempting to reach her. Yet she ignored the prosecutor's texts and made no effort to get in touch through other means. " '[I]t is unclear what effective and reasonable controls the People could impose upon a witness who plans to . . . simply "disappear." ' " (*Fuiava*, at p. 676.)

The trial court did not err in finding the prosecution exercised due diligence in attempting to locate Hendricks. Thus, the court properly deemed Hendricks "unavailable" such that her preliminary hearing testimony and earlier recorded statements that were played during the preliminary hearing were not erroneously admitted at trial.

B.    *The Trial Court Did Not Err by Not Instructing the Jury on Voluntary Manslaughter Based on Heat of Passion*

Wheeler did not request an instruction regarding voluntary manslaughter based on heat of passion but contends the trial court erred when it failed to give the instruction sua sponte. He contends Magana's statement, "If you want to light this shit up, we can all light this shit up," coupled with Magana's action of reaching behind his waistband, "was enough to engender fear and

20

trigger the sua sponte duty to instruct on heat of passion manslaughter." Wheeler is mistaken.

1.     *Relevant Legal Principles*

"[E]ven in the absence of a request, the trial court has a sua sponte duty to instruct on lesser included offenses when there is substantial evidence the defendant is guilty only of the lesser offense.  [Citation.]  This requirement is based upon the rule that 'the court must instruct sua sponte on "the 'general principles of law governing the case;' " i.e., those " 'closely and openly connected with the facts of the case before the court.' " ' " (*People v. Cook* (2001) 91 Cal.App.4th 910, 917.)  Voluntary manslaughter under a heat of passion theory is a lesser included offense of murder.  (§ 192; *People v. Avila* (2009) 46 Cal.4th 680, 705.)

However, "the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 162, disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.)  "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Ibid.*)  "Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed.  [Citations.]  Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*People v. Simon* (2016) 1 Cal.5th 98, 132.)

We review claims of instructional error de novo.  (*People v. Covarrubias* (2016) 1 Cal.5th 838, 919; *People v. Manriquez*

21

(2005) 37 Cal.4th 547, 581 [failure to instruct regarding voluntary manslaughter reviewed de novo].) "Doubts as to the sufficiency of the evidence should be resolved in the accused's favor." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1145.)

### 2. *There Was Insufficient Evidence of Heat of Passion*

A person who intentionally and unlawfully kills "upon a sudden quarrel or heat of passion" is guilty of voluntary manslaughter. (§ 192, subd. (a).) " 'Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter.' [Citation.] Heat of passion killing is distinct from malice murder because thought in some form is necessary 'to form either an intent to kill or a conscious disregard for human life.' [Citation.] A heat of passion killing . . . is one caused by an unconsidered reaction to provocation rather than the result of rational thought." (*People v. Vargas* (2020) 9 Cal.5th 793, 827-828.)

"A heat of passion theory of manslaughter has both an objective and a subjective component." (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).) Here, substantial evidence does not support either component.

Objectively, the defendant's reason must, at the time of his act, be " 'so disturbed or obscured by some passion . . . to such an extent as would render an ordinary person of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 948, 957 (*Beltran*).) "To satisfy this test, the victim must taunt the defendant or otherwise initiate the provocation." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) The provocative conduct may not be based on " 'predictable conduct by a resisting victim.' " (*People v. Jackson*

22

(1980) 28 Cal.3d 264, 306, overruled on other grounds by *Cromer*, *supra*, 24 Cal.4th at p. 901, fn. 3.) In other words, "[a] defendant may not provoke a fight, become the aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel or in the heat of passion. The claim of provocation cannot be based on events for which the defendant is culpably responsible." (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 83.)

The objective component is not satisfied here because all the evidence demonstrates Wheeler, not Magana, "initiate[d] the provocation." (*People v. Carasi*, *supra*, 44 Cal.4th at p. 1306.) Magana, Wheeler, and Hendricks came up with a plan to get high inside Hendricks's car. Wheeler offered to fetch needles from his father's house. But instead of returning with needles, Wheeler returned with a gun. He pointed the gun at Magana at a 45-degree angle and said, " 'Come over here. Come talk to me.' " Wheeler's combined actions—abruptly changing plans, issuing verbal commands, and pointing a gun—plainly amounted to assault with a firearm on Magana. (See *People v. Hartsch* (2010) 49 Cal.4th 472, 507-508 ["pointing a gun at someone in a menacing manner is sufficient" to establish assault with a firearm]; *People v. Culbert* (2013) 218 Cal.App.4th 184, 190 ["[f]ew objects are as inherently threatening as a firearm"].)

Magana's reaction, in reaching toward his waistband and saying, "If you want to light this shit up, we can all light this shit up," is "[p]redictable and reasonable conduct by a victim" resisting an assault with a firearm. (See *People v. Enraca* (2012) 53 Cal.4th 735, 760 ["Predictable and reasonable conduct by a victim resisting felonious assault is not sufficient provocation to

23

merit an instruction on voluntary manslaughter"]; *People v. Souza* (2012) 54 Cal.4th 90, 117 [victim's "actions, in standing up from the couch and reaching for . . . one of three armed unknown men bursting into the home [] constituted predictable and reasonable conduct by a victim resisting felonious assault, and not provocation"]; *People v. Thomas* (2012) 53 Cal.4th 771, 813 [no provocation where defendant put a gun between victim's eyes and threatened to shoot victim; victim's reaction in grabbing the gun was "predictable conduct"]; *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1313 [no provocation where defendant "instigated the fight with [the victim] by creating a loud disturbance at the residence, cursing the mother of the victim and girlfriend and, most particularly, challenging [the victim] to come out and fight"]; cf. *People v. Dominguez* (2021) 66 Cal.App.5th 163, 178 [victim's gang challenge, coupled with his act of lunging while reaching for an apparent weapon, constituted substantial evidence from which a jury could reasonably find objective provocation].)  Magana's conduct was insufficient provocation to merit an instruction on voluntary manslaughter.  (See *Enraca*, *supra*, 53 Cal.4th at p. 760.)

The subjective component of heat of passion was also not supported by substantial evidence.  "To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation."  (*Moye, supra*, 47 Cal.4th at pp. 549-550.)  The passion must be of an "extreme intensity," such as "[v]iolent, intense, high-wrought or enthusiastic emotion."  (*Beltran, supra*, 56 Cal.4th at p. 950, cleaned up.)

24

Wheeler points to no evidence that he "exhibited anger, fury, [] rage," or any other intense emotion at the time of the killing. (*People v. Manriquez*, *supra*, 37 Cal.4th at p. 585.) Wheeler did not testify at trial and his interview with detectives did not reveal anything about his state of mind. (Cf. *People v. Dominguez*, *supra*, 66 Cal.App.5th at p. 180 [defendants' testimony they felt " 'super panicked' " and " 'super scared' " after the victim issued a gang challenge and lunged at them constituted sufficient evidence of subjective provocation].) While Hendricks testified an argument occurred between Wheeler and Magana before the shooting, Wheeler became "quiet" after the argument. Then, during the 15-to-20-minute drive to Wheeler's father's house, Wheeler and Magana "were talking it out, like everything was all cool." They talked in a stress-free and "chill" manner about getting high together. Thus, the evidence showed Wheeler appeared calm by the time he arrived at his father's house, and Wheeler did not present any evidence to the contrary. (See *Moye*, *supra*, 47 Cal.4th at p. 550 [" ' "if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter" ' "]; *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1704 [no evidence from which jury could have found defendant acted rashly where defendant heard of reports of child molestation in morning and "thereupon went about his daily business and did not confront [victim] until later in the day[.] . . . The only inference to be drawn is that any passions that may have been aroused . . . had cooled"].) The jury could not have reasonably inferred that when Wheeler shot Magana he acted with " 'passion rather than from judgment.' " (*Beltran*, *supra*, 56 Cal.4th at p. 950.)

25

Because there was insufficient evidence of both objective and subjective provocation, the court did not err in failing to instruct the jury on heat of passion voluntary manslaughter.

C. *Substantial Evidence Supports the Murder Conviction*

Wheeler argues there is insufficient evidence supporting his second degree murder conviction because the record establishes as a "matter of law" that he acted in perfect or imperfect self-defense.[5]  Wheeler is incorrect.

### 1.    *Relevant Legal Principles*

It is well settled that "[i]n assessing the sufficiency of the evidence, we review the entire record to determine whether any rational trier of fact could have found defendant guilty beyond a reasonable doubt.  [Citation.]  'The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citation.]  In applying this test, we review the evidence in the light most favorable to the verdict and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence . . . .  [W]e may not reverse for insufficient evidence unless it appears ' "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' "  (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1157-1158, superseded in part by statute on other grounds as stated in *People v. Villegas* (2023) 97 Cal.App.5th 253, 281, fn. 9, review granted Jan. 31, 2024,

---

[5]    The trial court instructed the jury on both perfect and imperfect self-defense.

26

S283126, review dism. May 15, 2024.) "The uncorroborated testimony of a single witness is sufficient to sustain a conviction unless the testimony is physically impossible or inherently improbable." (*People v. Romero* (2019) 44 Cal.App.5th 381, 386.)

"'The doctrine of self-defense embraces two types: perfect and imperfect.'" (*People v. Iraheta* (2014) 227 Cal.App.4th 611, 620.) In the context of a homicide, perfect self-defense requires that the defendant actually and reasonably believed the use of deadly force was necessary to defend himself from imminent threat of death or great bodily injury. (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168; *People v. Battle* (2011) 198 Cal.App.4th 50, 72.) Perfect self-defense "is a complete justification, and such a killing is not a crime." (*People v. Elmore* (2014) 59 Cal.4th 121, 133-134, superseded by statute on other grounds; § 197.) "Imperfect self-defense is the killing of another human being under the actual but unreasonable belief that the killer was in imminent danger of death or great bodily injury. [Citation.] Such a killing is deemed to be without malice and thus cannot be murder." (*People v. Booker* (2011) 51 Cal.4th 141, 182, superseded by statute on other grounds.)

Neither perfect nor imperfect self-defense may "'"be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified."'" (*People v. Enraca, supra*, 53 Cal.4th at p. 761.) "Thus, a victim may respond to an attacker's initial physical assault with a physical counterassault, and an attacker who provoked the fight may not in asserting he was injured in the fray claim self-defense against the victim's

lawful resistance."  (*People v. Ramirez* (2015) 233 Cal.App.4th 940, 947.)

" ' "[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may not be justified then the issue is a question of fact for the jury to determine." ' "  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1044; accord, *People v. Clark* (1982) 130 Cal.App.3d 371, 378, abrogated on other grounds by *People v. Blakeley* (2000) 23 Cal.4th 82, 92.)

> 2.    *The Evidence Does Not Establish Self-Defense as a Matter of Law*

Wheeler argues the evidence is "uncontroverted" that the use of deadly force against Magana was justified.  He contends that upon hearing Magana say, " 'If you want to light this shit up, we can all light this shit up,' " and seeing Magana reach toward his waistband, he believed he needed to fire his gun.  Then, upon seeing Magana "continue[] to rush at him," Wheeler believed he needed to fire a second shot.

The record does not conclusively establish that Wheeler acted in perfect or imperfect self-defense.  At least " ' "some of the evidence tends to show" ' " that Wheeler's initial conduct was wrongful and created the circumstances that justified Magana's response.  (See *People v. Nguyen*, *supra*, 61 Cal.4th at p. 1044.) Hendricks testified that Wheeler pointed a gun at Magana and said, " 'Come over here.  Come talk to me.' "  As noted, the jury could reasonably conclude from the surrounding circumstances that Wheeler assaulted Magana with a gun.  (See *People v. Hartsch*, *supra*, 49 Cal.4th at pp. 507-508; *People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 210.)  Magana was thus legally

28

justified in responding to Wheeler's assault with a counterassault. (See § 693 [party about to be injured may use resistance sufficient to prevent offense against his person]; *People v. Ramirez*, *supra*, 233 Cal.App.4th at p. 948 ["Simply put, a defendant who assaults his victims with a gun may not set up a valid self-defense claim with evidence he believed the victims also reached for a gun, since they would be justified in meeting deadly force with deadly force"].) Because some evidence tends to show Wheeler created the circumstances which justified Magana's response, self-defense was not established as a matter of law and sufficient evidence supports Wheeler's conviction of second-degree murder.

## DISPOSITION

The judgment is affirmed.


STONE, J.

We concur:


MARTINEZ, P. J.


FEUER, J.